**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

EDELMAN FINANCIAL ENGINES,
LLC,

      Plaintiff,

v.

SCOTT BUTERA,

      Defendant.

\*

\*      Case No.: 22-1388

\*

\*

\*

_____

**<u>BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION …………………………………………………………………..…..1

COUNTERSTATEMENT OF FACTS…………………………………..………… 3

    A.    Edelman Financial Relies on Conjecture Rather Than Facts.. ............………........…..3

    B.    Mr. Butera Did Not Misappropriate Trade Secrets; Solicit Clients or Employees; Or Engage In Any Wrongdoing……………………………. ...…......…..6

    C.    Edelman Financial Purports to Always Place Clients' Interests Before Itself.............9

ARGUMENT………………………………………………….......................……....11

    A.    General Principles of Law-Injunctive Relief……………………………...…………11

    B.    The Facts Do Not Support Injunctive Relief …………...………………......…...…12

        1.    Plaintiff Cannot Establish a Strong Likelihood of Success on the Merits……….12

            a.    Trade Secret Claims.……………………………………………………12

            b.    Breach of Contract………………………………………...…………20

                i.    Mr. Butera did not solicit former customers…………………………20

                ii.    Mr. Butera has not solicited Employees of Edelman Financial……...24

                iii.    Edelman Financial Cannot Prevent Non-Party Public Customers from Choosing to Work with Mr. Butera………………..24

            c.    Breach of Fiduciary Duty and Unfair Competition Claims…………………28

        2.    The Balance of Hardships Weighs in Favor of Mr. Butera…………...…………30

        3.    Public Policy Strongly Favors the Free Movement of Customers and therefore Heavily Weighs Against the Proposed Injunctive Relief……………...33

CONCLUSION………………………………………………..…............……………35

# TABLE OF AUTHORITIES

**Cases**

Albert S. Smyth v. Motes
 2018 WL 3635024 (D. Md. July 31, 2018) .................................................................................. 18

Allan M. Dworkin, D.D.S., PA v. Blumenthal
 77 Md. App. 774, 781-82 (1989) ........................................................................................ 14

Allstate Ins. Co. v. Warns,
 2012 WL 681792 (D. Md. Feb. 29, 2012) ................................................................................ 29

American Express Fin. Adv., Inc. v. Torley
 971 F. Supp. 780 (W.D. N.Y. 1997) ................................................................................... 30,31

Baltimore Bedding Corp. v. Moses,
 34 A.2d 338 (Md. 1943) ........................................................................................... 30

Blades of Green v. Go Green Lawn.,
 2022 WL 1136888 (D. Md. April 18, 2022) .............................................................................. 19

Brightview Group v Teeters,
 2021 WL 1238501 (D. Md. March 29, 2021) ............................................................................ 16

Capstone Fin. Advisors, Inc. v. Plywaczynski,
 46 N.E.3d 419 (Ill App. 2nd 2015) ...................................................................................... 21

Dan River, Inc. v. Icahn,
 701 F.2d 278 (4th Cir. 1983) ........................................................................................... 31

Deerfield Medical Ctr. v. City of Deerfield,
 661 F.2d 328 (5th Cir. 1981) .......................................................................................... 30

Direx Israel, Ltd. v. Breakthrough Med. Corp.,
 952 F.2d 802 (4th Cir. 1991) ........................................................................................... 31

Edelman Financial v. Cary Street,
 FINRA case no. 18-03329 (March 19, 2019) ............................................................................. 2

Edward D. Jones & Co. v. Kerr,
 415 F. Supp. 3d 861 (S.D. Ind. 2019) ............................................................................. 21,22,34

Edward Jones v. Peterson,
 FINRA Arbitration No. 19-03340, 2021 WL 5239912 (November 3, 2021) ............................... 13

Edwards v City of Goldsboro,
 178 F.3d 231 (4th Cir. 1999) .......................................................................................... 18

Enterprise Int'l, Inc. v. Coporacion Estatal Petroleva Ecuatoriana,
 762 F.2d 464 (5th Cir. 1985) .......................................................................................... 30

FTI Consulting v. Graves,
        2007 WL 2192200 (S.D.N.Y. 2007) ...................................................................................21

Getman v. USI Holdings Corp.,
        2005 WL 2183159 (Mass. Super. Ct. Sept. 1, 2005) .....................................................21

Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC,
        902 F.3d 432 (4th Cir. 2018) ..........................................................................................11

Home Paramount Pest Control Companies, Inc. v. FMC Corp./Agr. Prod. Grp.,
        107 F. Supp. 2d 684 (D. Md. 2000) ...........................................................................14,19

Hughes Network Sys., Inc. v. InterDigital,
        17 F.3d 691 (4th Cir. 1994) .........................................................................................12,30

J.P. Morgan Securities, LLC v. Riley,
        United States District Court for the W.D. of MI, docket no. 1:20-cv-00736-HYJ-RSK ..........31,32

Kissinger Financial Services v Kissinger,
        2021 WL 1017400 (D. Md. March 17, 2021) .................................................................18

Mazurek v. Armstrong,
        520 U.S. 968, 972 (1997) ................................................................................................11

McGough v. Nalco Co.,
        203 Fed. Appx. 450 (4th Cir. 2006) ...............................................................................11

MCS Servs., Inc. v. Jones,
        2010 WL 3895380 (D. Md. Oct. 1, 2010) ......................................................................15

Medispec, Ltd. v. Chouinard,
        133 F. Supp. 3d 771 (D. Md. 2015) ................................................................................24

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Brinkman,
        2008 WL 4534299 (D. Ariz. Oct. 3, 2008) .................................................................21,33

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Liniere,
        572 F. Supp. 246 (N.D. Ga. 1983) ..................................................................................33

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor,
        194 F.R.D. 618 (N.D. Ill. 2000) ......................................................................................21

Microstrategy Inc. v. Motorola, Inc.,
        245 F.3d 335 (4th Cir. 2001) ..........................................................................................11

Morgan Stanley DW, Inc. v. Frisby,
        163 F. Supp 2d 1371 (N. D. Ga. 2001) ...........................................................................31

Munaf v. Green,
        553 U.S. 674 (2008) ........................................................................................................11

Operations Research, Inc. v. Davidson & Talbird, Inc.,
217 A.2d 375 (Md. 1966) ....................................................................................... 33

Padco Advisors v Omdahl,
179 F. Supp. 2d 600 (D. Md. 2002) ........................................................................ 19

Phillips N.A. v. Hayes,
2020 WL 5407796 (D. Md. Sept. 9, 2020) .............................................................. 17

Precigen v Shuyan Zhang,
2020 WL 3060398 (D. Md. June 9, 2020) ............................................................... 16

Prudential Securities, Inc. v. Plunkett,
8 F.Supp.2d 514 (E.D. Va. 1998) ........................................................................... 31

Roland Machinery Co. v. Dresser Industries, Inc.,
749 F.2d 380, 386 (7th Cir. 1984) .......................................................................... 30

Ruhl v. F.A. Barlett Tree Expert Co.,
225 A.2d 288 (Md. 1967) ....................................................................................... 33

Sampson v. Murray,
415 U.S. 61 (1974).................................................................................. 11, 30, 31

Sindicato Puertorriqueno de Trabajadores v. Fortuno,
699 F.3d 1 (1st Cir. 2012)....................................................................................... 12

Spirax Sarco, Inc. v. SSI Eng'g, Inc.,
122 F. Supp. 3d 408 (M.D.N.C. 2015)...................................................................... 15

Tucker Anthony Realty Cop. v. Schlesinger,
888 F.2d 969 (2d Cir. 1989)..................................................................................... 31

Ultimate Outdoor Movies, LLC v. FunFlicks, LLC,
2019 WL 2642838 (D. Md. June 27, 2019) ......................................................... 11,15

Virginia Petroleum Jobbers Ass'n v. Federal Power Comm.,
259 F.2d 921 (D.C. Cir. 1958).................................................................................. 31

Wachovia Sec., LLC v. Stanton,
571 F. Supp. 2d 1014 (N.D. Iowa 2008)................................................................... 33

Wells v. Merrill Lynch,
919 F Supp. 1047 (E.D. Ky. 1994) ........................................................................... 21

Winter v. Nat. Res. Def. Council, Inc.,
555 U.S. 7 (2008)...................................................................................................... 11

**Statutes**

15 U.S.C. 78o–3(b)(6) ..................................................................................................................... 27

18 U.S.C. § 1839(3)(A)–(B) ........................................................................................................... 14

Md. Code Ann., Comm. Law § 11-1201(e)(1)–(2)......................................................................... 14

Md. Code Ann., Comm. Law § 11-1204(1)............................................................................... 13, 20

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | | |
|---|---|---|
| **EDELMAN FINANCIAL ENGINES, LLC**, | * | |
| Plaintiff, | * | Case No.: 22-1388 |
| v. | * | |
| **SCOTT BUTERA**, | * | |
| Defendant. | * | |

---

**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

AND NOW COMES Scott Butera ("Mr. Butera"), by and through undersigned counsel, and submits his Opposition to the Motion for Temporary Restraining Order and Preliminary Injunction of Edelman Financial Engines, LLC ("Plaintiff" or "Edelman Financial") and avers as follows:

**INTRODUCTION**

Plaintiff's Motion should be denied as it fails to meet the heavy burden of demonstrating entitlement to the extraordinary remedy of temporary injunctive relief. First, Plaintiff cannot demonstrate that it is likely to prevail on the merits of its underlying claims because Edelman Financial has not met its burden of providing evidence of wrongdoing by Mr. Butera's with respect to any claims for misappropriation or solicitation. Edelman Financial's claims are based solely on speculation and vague, conclusory allegations with no availing evidence such as the results of forensic examination or even an identification of what supposedly proprietary information is even at issue. Mr. Butera submitted a declaration on first-hand knowledge directly stating that he did not retain any Edelman Financial confidential information or trade secrets, he has not solicited any clients, and he has not solicited any employees of Edelman Financial.

1

Plaintiff otherwise seeks to impose an unconscionable restrictive covenant that prohibits non-party public customers from working with their chosen financial advisor, in violation of both federal rules and applicable law, even though many of those customers have built a relationship of trust and comfort with Mr. Butera over the last 10-20 years.  Most disturbingly, Edelman Financial asserts, during an ongoing decline in the securities markets no less, that it is Edelman Financial alone who has the power to dictate the decision of a public customer as to who can service their accounts.  Edelman Financial flaunts the notion of customer free will and its own obligations as a fiduciary to act in the best interests of the customer.  Edelman Financial instead takes the startling position that its own best interests always come first and the customer is not permitted to decide how their hard-earned money will be serviced.   This Honorable Court should be aware that Edelman Financial has been unsuccessful in a recent attempt to enforce this same restrictive covenant.  See e.g., Edelman Financial v. Cary Street, FINRA case no. 18-03329 (March 19, 2019) (denying in its entirety request for $3.2M in damages and request for injunctive relief including request to enjoin "accepting any business of the same or similar nature to Claimant's business.")[1] Notably, many of those customers have built a relationship of trust and comfort with Mr. Butera over the last 10-20 years.  These clients are not parties to this litigation, have not been provide with notice of this motion, and have no representation before this Court.  Yet, Edelman Financial asks, during an ongoing decline in the securities markets, that this Court strip those clients of their power of choice and to vest in Edelman Financial alone the power to dictate who can service their accounts.  This request is directly contrary to the fiduciary obligations of Edelman Financial to customers, directly contrary to the promises made by Edelman Financial to those customers, and against public policy.

---

[1] https://www.finra.org/sites/default/files/aao_documents/18-03329.pdf

Moreover, there is no threat of irreparable harm in the absence of an injunction. As confirmed in his sworn declaration, Mr. Butera engaged in no wrongdoing and has no plans to do so. If Plaintiff has a grievance with Mr. Butera, any harm it claims to suffer can be adequately addressed through monetary damages– that is, if Plaintiff can prove liability – as it ultimately seeks to quantify damages through revenue generated by customers who chose not to work with Plaintiff.

Plaintiff otherwise cannot establish that the balance of harms favors Edelman Financial, or that an injunction would serve the public interest, particularly amidst a recent worldwide pandemic of unprecedented proportions that created ongoing volatility in the markets along with social and economic uncertainty for millions of Americans. Seeking an injunction in this economic climate, which restricts communications between clients and the financial advisor who has worked with them for years, serves only the interests of Edelman Financial's, and is entirely unwarranted by applicable law and unsupported by the evidence submitted to support Edelman Financial's request.

What non-party public customers do not need, particularly at this time, is an order restricting their communications with their trusted financial advisor and forcing them against their will to begin working with someone new. Plaintiff's request for injunctive relief attempts to do just that: prevent Mr. Butera from communicating with his clients to interfere with the clients' right to decide with whom they want to work.

<u>**COUNTERSTATEMENT OF FACTS**</u>

**A.    EDELMAN FINANCIAL RELIES ON CONJECTURE RATHER THAN FACTS**

To support its position that the "extraordinary" relief of a temporary restraining order is needed, Edelman Financial relies solely on the declaration of Thomas Dunker (the "Dunker Declaration"). The Dunker Declaration largely consists of conclusory statements, legal buzzwords, and total conjecture based on "information and belief," as opposed to firsthand knowledge. For example, the Dunker Declaration uses the ambiguous term "goodwill" *ad*

3

*nauseum* without bothering to define or explain it.  Based upon the Dunker Declaration, it appears that Dunker personally has had no contact with the clients he claims were solicited.

The Dunker Declaration asserts that Plaintiff maintains a "database of current, former, and prospective client lists, confidential information related to a client's assets, portfolio, detailed demographics, family composition and wealth, debt, retirement goals and timeline, investment history and future ability, and other proprietary information regarding client profiles, vendor relationships, and referral sources." (Dunker Dec. ¶10)  The Dunker Declaration further states that "After 16 years of employment with Edelman, Defendant has substantial knowledge about Edelman's clients, trade secrets, and confidential and proprietary client information..." (Dunker Dec. ¶49)  Peculiarly, or perhaps transparently, the Dunker Declaration makes no effort to explain if, how, when or which records were supposedly misappropriated. There is no discussion of a forensic audit of Mr. Butera's workstation. There is no discussion of a review of his work emails. There is no mention of any first-hand knowledge of an actual misappropriation.

The Dunker Declaration sets forth allegations that "Edelman's Irreparable Harm and Financial Loss." (Dunker Dec. p.10)  However, these statements are entirely conjecture based on "information and belief" and "the experience" of the declarant.  There is no discussion of the information upon which the declarant's belief is formed and no explanation of the similar experiences that lead to these conclusions.  Instead, there are entirely presumptive and flimsy allegations such as that "Based on my experience, given the large number of accounts that have transferred to Defendant in a short period of time, and given the fact that three of those accounts had confirmed contact with Defendant, it is likely that Defendant affirmatively contacted and solicited all 21 account holders to join him..." (Dunker Dec. ¶46)

4

The Dunker Declaration is glaringly deficient for a number of its omissions.  The Dunker Declaration fails to articulate what it contends to be a misappropriated "trade secret."  The Complaint argues that it is the "proprietary database and compilation of confidential client lists, client information, referral sources, financial analysis, and client investment data...," however this is not clearly articulated in the Dunker Declaration.  (Compl. ¶68).  Again, the Dunker Declaration does not purport to argue that any of this information was even taken by Mr. Butera through hearsay or otherwise.  It does not provide any evidence of Mr. Butera "soliciting" clients or otherwise inducing them to leave Edelman Financial.  There are no statements that anyone witnessed Mr. Butera taking this information.  There is no reference to forensic analysis of any computer system purporting to show that Mr. Butera illicitly downloaded sensitive information.  There are no allegations that any business or financial records are missing or been offloaded electronically or in hard copy.  There is no evidence offered that Mr. Butera misappropriated anything.

The Dunker Declaration next takes issue with Mr. Butera accepting the business of clients who decided that they did not want to work with Plaintiff.  However, such clients are investors who make their own personal decisions such as where they would like to invest their money and who they would like to guide them with their finances.  If the customer believes that they would be better served working somewhere else, other than Edelman Financial, then it should be their decision.  The customers themselves are not trade secrets belonging to Edelman Financial which need to be protected from the world.  Moreover, non-party public customers cannot be adversely affected by virtue of an agreement to which they are not even a party.

**B.     MR. BUTERA DID NOT MISAPPROPRIATE TRADE SECRETS; SOLICIT CLIENTS OR EMPLOYEES; OR ENGAGE IN ANY WRONGDOING.**

Mr. Butera has resided in Maryland for nearly thirty years.  (Butera Aff. ¶2)  He is an active volunteer with the Montgomery County (MD) Coalition of Homelessness (MCCH) for the last ten (10) years.  (Butera Aff. ¶2)  He and his family are members of the Bethesda United Methodist Church, where he formerly served as a confirmation mentor.  (Butera Aff. ¶2)  Mr. Butera is 1997 graduate of the University of Maryland with a degree in economics.   (Butera Aff. ¶3)  He began his career in the financial services industry in 1997 and worked with several firms for the next decade.  He became associated with various iterations and predecessor firms of Edelman Financial from July through May 2022.  (Butera Aff. ¶4)

Critical to the present motion is that Mr. Butera has been a Certified Financial Planner ("CFP®") since 2004.  (Butera Aff. ¶5)  Edelman Financial was aware that he carried that designation,  benefited from it for more than fifteen years, and must accept the responsibilities of having an employee with a CFP® designation, not just the benefits.  The CFP® designation is a highly respected certification in the financial services sector, demonstrating that he has met extensive training requirements, and is committed to the high ethical standards.  (Butera Aff. ¶5)  A cursory review of Edelman Financial's website reflects how Edelman Financial promotes the CFP® designation of its advisors. See https://www.edelmanfinancialengines.com The CFP® designation of each advisor is prominently displayed at the top of each advisor's biography page, reflecting a promise by Edelman Financial that the advisor will act as a CFP® and follow the CFP® Code of Ethics.

As a CFP®, Mr. Butera is subject to a stringent Code of Ethics which requires him to act in the best interests of his clients at all times which includes a duty of loyalty and duty of care. See CFP® Code of Ethics, rules 1 and 10.   https://www.cfp.net/ethics/code-of-ethics-and-

6

standards-of-conduct. The fact that their trusted advisor of many years left Edelman Financial and is no longer able to service their accounts at Edelman Financial would undoubtedly be important to any client.  Similarly, Mr. Butera was under an obligation to provide "[a]ny ... information about the CFP® professional or the CFP® Professional's Firm that is Material to a Client's decision to engage or continue to engage the CFP® professional or the CFP® Professional's Firm."  (CFP® Rule 10(a)(viii))  Again, the fact that their trusted advisor of many years is no longer with Edelman Financial is similarly important for any client to decide whether to continue to engage with the CFP® Professional's former Firm, i.e. Edelman Financial.

Mr. Butera resigned from Edelman Financial on  May 12, 2022 and became affiliated with LPL Financial LLC ("LPL") in Bethesda, MD.  (Butera Aff. ¶6)  When he decided to resign, he did not remove or retain any client lists or data from Edelman Financial.  (Butera Aff. ¶7)  Some clients are family members and family friends.  (Butera Aff. ¶8) Others have their contact information readily available through public information such as WhitePages.com and LinkedIn. (Butera Aff. ¶8)  Mr. Butera has not solicited any clients to transfer their accounts, despite Edelman Financial's allegations to the contrary.  (Butera Aff. ¶9)  After joining LPL on May 12, 2022, he announced his new affiliation to his clients via either a written announcement or a telephone announcement; he has not solicited any of his clients to follow him from Edelman Financial to LPL. (Butera Aff. ¶10)   He advised clients that he left Edelman Financial and joined LPL and provided the new contact information.  (Butera Aff. ¶10)  If clients had questions or asked for information, he answered those questions or provided the requested information.  (Butera Aff. ¶11) Otherwise, the conversation ended immediately.  (Butera Aff. ¶11)  Some clients told him that they wish to continue doing business at his new firm.  (Butera Aff. ¶12)  Clients that wanted to transfer their accounts were provided with the information and documentation they needed to

trigger the account transfer process. (Butera Aff. ¶12) He did not provide account transfer information or documentation to any client who did not request it. (Butera Aff. ¶12)

Mr. Butera avers that his clients rely on him to help them manage their finances and investments, and he owes it to them to let them know where he is. (Butera Aff. ¶13) As a CFP®, he acts as a fiduciary when providing financial advice to clients. (Butera Aff. ¶13) He does not want to violate their trust or leave them feeling abandoned without letting them know how to contact him if needed. (Butera Aff. ¶13) This is particularly important in light of recent volatility in the markets.[2] (Butera Aff. ¶13) He has not solicited clients or encouraged them to transfer their accounts to his new firm. (Butera Aff. ¶14) He has conducted himself in accordance with the agreement and with industry standards. (Butera Aff. ¶14)

The injunction sought by Edelman Financial would be damaging to clients who need and deserve to be able to communicate freely with their chosen financial advisor. (Butera Aff. ¶15) The injunction would be personally devastating to Mr. Butera as well, after spending years developing his book of business and reputation with his clients and in the community. (Butera Aff. ¶15) Mr. Butera has legitimate concerns that a Court Order would suggest to clients and others in the financial services community that he engaged in some type of wrongful conduct, and that he will not be able to repair the resulting tarnish on his reputation. (Butera Aff. ¶15)

Plaintiff has $290 **billion** in assets as of June 2022 spread amongst 1.5M accounts.[3] (Butera Aff. ¶16) Edelman Financial's website shows 150+ locations including six (6) offices in

---

[2] The S&P 500 shifted more than 1,000 points from a high of 4,808 during the week of January 3, 2022 to a low of 3,807 during the week of May 16, 2022. See https://finance.yahoo.com/quote/ES%3DF/history?period1 =1623110400&period2=1654646400&interval=1wk&filter=history&frequency=1wk&includeAdjustedClose=true NASDAQ shifted more than 5,000 points from a high of 16,212 during the week of November 22, 2021 to a low of 11,035 during the week of May 20, 2022. https://finance.yahoo.com/quote/%5EIXIC/history?period1 =1623110400&period2=1654646400&interval=1wk&filter=history&frequency=1wk&includeAdjustedClose=true

[3] https://reports.adviserinfo.sec.gov/reports/ADV/104510/PDF/104510.pdf   By way of further illustration, the $31M in departed customer accounts (see Dunker dec. at ¶ 45) comprise .0001% of Plaintiff's total assets under management.

Maryland.[4]  (Butera Aff. ¶16)  In that context, it is not remotely plausible for Edelman Financial to claim that one advisor in Bethesda somehow threatens this institution with irreparable harm.  (Butera Aff. ¶16)  The only people facing irreparable harm are, first and foremost, Mr. Butera's clients who want to continue using him as their trusted financial advisor during an uncertain economic environment; and second, he, his wife who does not actively work outside the home, and his minor children, who rely on him to financially support their family.  (Butera Aff. ¶17)

Mr. Butera further denies that he ever solicited any Edelman Financial employee to leave their employment.  He specifically denies that he solicited Niki Wheeles to leave Edelman Financial, as she approached him about her desire to leave Edelman Financial.  He has made every effort to comply with any legal obligations, and intends to continue to do so.  (Butera Aff. ¶18, 19)

## C.   EDELMAN FINANCIAL PURPORTS TO ALWAYS PLACE CLIENTS' INTERESTS BEFORE ITSELF.

Edelman Financial seeks an injunction which, in part, prevents public customers from deciding who manages their assets amidst a volatile downturn in the securities markets.  Edelman Financial selfishly puts its interests ahead of public customers who may be rightfully concerned about the downturns in the market and the departure of their trusted advisor.

In this context, it is important how Edelman Financial portrays itself to the Securities and Exchange Commission ("SEC"), clients, and the world through public disclosures.  First, Edelman Financial has a marketing and informational piece entitled the "Client Relationship Summary."[5] That document contains poses the rhetorical question, "What are your legal obligations to me when

---

[4] https://www.edelmanfinancialengines.com/financial-planners/

[5] https://www.edelmanfinancialengines.com/wp-content/uploads/2022/04/FEA_CRS.pdf

acting as my investment adviser? How else does your firm make money and what conflicts of

interest do you have?"  Edelman Financial's response is that:

> When we act as your investment adviser, **we have to act in your best interest and not put our interest ahead of yours**. At the same time, the way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the investment advice we provide you. Here is an example to help you understand what this means. **Our planners have an economic incentive to encourage you to invest money through them, since this increases their compensation** (because they are paid in part based on the assets they manage). While we do not believe this is a material conflict, you should be aware of this.

(Emphasis added)  These sentiments echo the CFP® ethical standards Mr. Butera must abide by.

> Edelman Financial's publicly available fee disclosures[6] include a code of ethics:

> **Of primary importance to the policies within the Code is adhering to a fiduciary standard and putting the interests of our clients first.** Maintaining high standards of ethical conduct is core to Edelman Financial Engines and the manner in which we approach financial planning. To that end, the Code establishes and reinforces the standard of business conduct that is expected of employees and provides specific guidance related to avoiding actual or apparent conflicts of interest. The Code emphasizes certain governing principles that **employees should always be mindful of in the course of their work, including the duty to place the interests of clients first**, the importance of protecting material non-public information and the obligation to report violations of the Code.

(Emphasis added)  Edelman Financial' s purported efforts to "place the interests of clients first"

is reiterated in Edelman Financial's Part 2A of its Form ADV.[7]  Again, this provides, "Of primary

importance to the policies within the Code is adhering to a fiduciary standard and **putting the best**

**interests of our clients first**."  (Emphasis added).

Edelman Financial does not have a monopoly on the customers, nor does it control their

decisions.  Everything that Edelman Financial claims to be to the world is a charade if they are

---

[6] https://www.edelmanfinancialengines.com/wp-content/uploads/2022/04/Wrap_Fee_Brochure.pdf

[7] https://www.edelmanfinancialengines.com/wp-content/uploads/2022/04/FEA_ADV2A_B.pdf at p. 28.

10

permitted to put their own interests ahead of the client's best interest to work with whomever they choose.

## ARGUMENT

### A.   GENERAL PRINCIPLES OF LAW- INJUNCTIVE RELIEF

Temporary restraining orders, like preliminary injunctions, are extraordinary relief: "A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." McGough v. Nalco Co., 203 Fed. Appx. 450, 453 (4th Cir. 2006)(internal citations omitted). Such relief may only issue if plaintiff has no adequate remedy at law. Sampson v. Murray, 415 U.S. 61, 88 (1974). As recognized by the United States Supreme Court, the "extraordinary and drastic remedy" of a preliminary injunction should not be awarded unless the plaintiff clearly meets its burden of persuasion with "substantial proof." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (internal quotations omitted).  A temporary restraining order, similar to a preliminary injunction, affords "'an extraordinary and drastic remedy' prior to trial." Ultimate Outdoor Movies, LLC v. FunFlicks, LLC, 2019 WL 2642838, at *6 (D. Md. June 27, 2019) (quoting Munaf v. Green, 553 U.S. 674, 689-90 (2008)); see also MicroStrategy, Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (stating preliminary injunctive relief is an "extraordinary remed[y] involving the exercise of very far-reaching power [that is] to be granted only sparingly and in limited circumstances").

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "Winter made clear that each of these four factors must be satisfied to obtain preliminary injunctive relief." Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC, 902 F.3d 432, 439 (4th Cir. 2018).  Because issuing a preliminary injunction

11

"requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way," "[t]he danger of a mistake in this setting is substantial." Hughes Network Sys., Inc. v. InterDigital, 17 F.3d 691, 693 (4th Cir. 1994) (internal quotations omitted).

**B.    THE FACTS DO NOT SUPPORT INJUNCTIVE RELIEF**

**1.    Plaintiff Cannot Establish a Strong Likelihood of Success on the Merits.**

"To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato Puertorriqueno de Trabajadores v. Fortuno, 699 F.3d 1, 10 (1st Cir. 2012) (internal citations omitted).  Edelman Financial has not made this showing.

It is difficult to parse how Edelman Financial feels it was harmed.  Its initial pleadings, and in particular the declaration of Thomas Dunker, have scant reference to what Edelman Financial believes to have actually occurred in lieu of Mr. Dunker's frequent non sequitur "in my experience" followed by a conclusory statement with no supporting proof.  The claims, as best can be understood, distill to four (4) categories, the first of which is couched as violations of trade secret statutes while the latter three (3) allegations are framed as contractual duties:  1. Alleged misappropriation of trade secrets;  2. Alleged solicitation of customers;  3. Alleged solicitation of Plaintiff's employee; and 4. Acceptance of accounts from customers that decided to transfer away from Edelman Financial.  As discussed hereafter, Plaintiff offers only guesses, unfounded accusations and conclusory statements which are not remotely tethered to the actual events.

**a.    Trade Secret Claims**

Plaintiff offers no coherent indication what was supposedly taken by Mr. Butera.  Given that he resigned on May 12, 2022, Edelman Financial presumably conducted a forensic analysis of his workstation and emails yet cites no evidence of any information being misappropriated, let alone information rising to the level of a protected trade secret.  Plaintiff's flimsy accusations are

12

predicated merely on Mr. Dunker's non sequitur "based on my experience" followed by the conclusory and salacious accusation that Mr. Butera stole trade secrets.  (See Dunker Dec. at ¶51)

Plaintiff's motion further suggests, without elaboration, that "Defendant has plainly disclosed Edelman's trade secrets."  (See Plaintiff's Brief at p. 9)  Plaintiff's motion also curiously references Mr. Dunker's declaration for the proposition that "Defendant quickly used Edelman's trade secret information – including Edelman's client lists, its compiled information concerning client assets and investment history, and client personal information – to raid Edelman's clients on behalf of a direct competitor." (See Plaintiff's Brief at p. 9 citing Dunker Dec. ¶45-52)  However, Mr. Dunker's Declaration makes no such affirmation.  There are no accusations that Mr. Butera actually misappropriated any customer records.   No proof is offered of missing customer information and Plaintiff must know by now if anything was missing.  Edelman Financial presents no evidence of misappropriation because none exists.

This Honorable Court may award attorney's fees to Defendant under the Maryland Trade Secrets Act when a misappropriation claim is made in bad faith.  See Md. Code Ann., Comm. Law § 11-1204(1).   Edward Jones was recently found responsible for more than $315,000 in Defendants' attorney's fees under the Nevada UTSA, which is nearly identical to the Maryland UTSA, predicated on a misappropriation of trade secrets claims being made in bad faith.  See Edward Jones v. Peterson, FINRA Arb. No. 19-03340, 2021 WL 5239912 (November 3, 2021).[8]

It is exceedingly difficult to comprehend how Plaintiff has remotely demonstrated that it is likely to succeed on the merits of its claims related to supposed misappropriation of trade secrets under either the Federal Defend Trade Secret Act or the Maryland UTSA.  To be deemed a trade secret, Edelman Financial must show both that (1) the information "derives independent economic

---

[8] https://www.finra.org/sites/default/files/aao_documents/19-03340.pdf

value ... from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information" and (2) the owner of the trade secret takes "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A)–(B); Md. Code Ann., Com. Law § 11-201(e)(1)–(2) (defining trade secrets by the same dual requirements of "independent economic value" and "reasonable" efforts to maintain secrecy).

To the extent that Edelman Financial purports to suggest that a customer list is the proprietary information at issue, careful analysis is given by the courts to evaluate whether the customer list is a trade secret and determinations are made on a case-by-case basis. Generally speaking, where the client list is either publicly known or can be generated by publicly available sources, the client lists are not afforded trade secret protection. See e.g., Home Paramount Pest Control Companies, Inc. v. FMC Corp./Agr. Prod. Grp., 107 F. Supp. 2d 684, 693 (D. Md. 2000)(finding "the names and addresses of York's [top fifty] clients" are not protected trade secrets because they are "obtainable through public sources such as a phone directory and trade associations"); Allan M. Dworkin, D.D.S., PA v. Blumenthal, 77 Md. App. 774, 781-82 (1989)(deeming a client (patient) list of a dental practice not to be a trade secret because the plaintiff took no measures to guard secrecy of the list, and there was little evidence to indicate that an extraordinary amount of effort or money was expended by the plaintiff to generate the list").

To determine whether the publicly available names of Mr. Butera's customers constitute trade secrets, Maryland state and federal courts look to the following factors as "helpful guidance" despite the preemption of common law definitions of trade secrets:

> (1) The extent to which the information is known outside of the employers business; (2) the extent to which it is known by employees and others involved in the employer's business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the

14

employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Ultimate Outdoor Movies, LLC v. FunFlicks, LLC, No. CV SAG-18-2315, 2019 WL 2233535, at *17 (D. Md. May 23, 2019) (internal citations and bracketing omitted). In the matter at hand, not a single factor noted above weighs in favor of applying trade secret protection to the names of Mr. Butera's customers that he was able to generate from publicly available sources.

Where customer lists are afforded protection, the inquiry focuses not merely on customer identity but on associated pricing information, which is not at issue here. See e.g., MCS Servs., Inc. v. Jones, No. WMN-10-1042, 2010 WL 3895380, at *7 (D. Md. Oct. 1, 2010) (finding customer lists have independent economic value where company exerted resources to create lists and company's competitors could use list to undercut company's prices); Spirax Sarco, Inc. v. SSI Eng'g, Inc., 122 F. Supp. 3d 408, 426 (M.D.N.C. 2015) (ruling that a customer list, "old and new product prices," and other information related to products offered to or requested by previous consumers properly constituted trade secrets, at least at the pleading stage).

Information that Mr. Butera knows from his personal life or that is available through searches of public sources is not a "trade secret." To be considered a "trade secret," information must "[d]erive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Edelman Financial's trade secrets claim fails for this reason, as the information at issue – client contact information available and derived through public sources – is readily available, easy to acquire, and easily known outside of Edelman Financial's business. When such customer contact information is "readily ascertainable," it simply is not a trade secret.

The agreement at issue also includes Edelman Financial's definition of proprietary information as not including "information that (1) becomes or has been generally available to the

15

public other than as a result of Participant's disclosure; (2) was available to Participant on a non-confidential basis prior to its disclosure by the applicable member of the Partnership Group or (3) is independently developed or becomes legitimately available to Participant on a non-confidential basis form a source other than the Partnership Group." (Restrictive Covenant Agreement, p. 9)

In addition, cases cited by Plaintiff are inapposite and do not evade the simple truth that the information at issue is not protectable as a trade secret and no trade secret was misappropriated. Precigen v Shuyan Zhang, 2020 WL 3060398 (D. Md. June 9, 2020) involved a TRO being granted amidst allegations of corporate espionage involving a Chinese biopharmaceutical company and competition for international patents.  The former employee allegedly misappropriated a "unique image of a protein blot identical to one [Plaintiff] prepared as part of a confidential, non-public application to the U.S. Food and Drug Administration" and provided to a competitor firm in China. The employee reset company issued hardware to factory settings, reconfigured an additional laptop and deleted extensive files which includes "specific documents that were confidential to [Plaintiff] and that [Plaintiff] asserts are relevant to work done by [the new employer]; and defendant "attempted to transfer certain files after his employment with [Plaintiff] had ended and he was set to begin work with [the new employer]."  The Court granted the TRO and found that Defendant's "own deceptive and suspicious behavior that has caused this to be necessary." Precigen, 2020 WL 3060398, at *2.  The alleged information at issue here does not remotely rise to this level of protected trade secret information nor has Edelman Financial offered even a scintilla of proof let alone the extensive evidence offered in this case involving international biopharmaceutical patents.

Brightview Group v Teeters, 2021 WL 1238501 (D. Md. March 29, 2021) involved former high-level employees of a senior living facility developer and operator which left to start a competing company.  After forensic evaluation of company issued laptops and phones, Plaintiff

16

discovered that defendants saved "thousands" of Plaintiff's documents to personal portable electronic storage devices and "downloaded myriad [Plaintiff] documents that [Plaintiff] claims contain trade secret or confidential and proprietary information" which included product development materials such as operational guidelines and blueprints;  market analysis materials such as trade secret pricing, leasing analysis, and demographic analyses; and site selection materials which included "project pipeline secret underwriting system trade secret building plans." The court determined that the "financial" and "business" information at issue  derived independent economic value as such reflected "granular detail about the financial performance of [Plaintiff's] portfolios of properties as well as occupancy, revenue, and expense detail at a community level." Brightview, 2021 WL 1238501, at *5-6.  Plaintiff cites no information being misappropriated, let alone sensitive business information of such "granular detail" as was the subject of Brightview.

Phillips N.A. v. Hayes, 2020 WL 5407796 (D. Md. Sept. 9, 2020) involved the alleged misappropriation by a former employee of sensitive business and financial information.  The plaintiff presented evidence that its former employee "accessed, downloaded and printed" protected information which included, "equipment manufacturing information, national product supply funnel information, business and strategic plans, marketing, account strategies, pricing, national orders and sales, and relationships with, customers and clients [as well as] business plans for 2019 and 2020, lists of pending orders and sales funnels for the entire United States, information regarding manufacturing status of completed sales, presentations regarding new Philips market initiatives, marketing and strategic plans and detailed information regarding specific Philips customers, orders, pricing and sales initiatives." Phillips N.A., 2020 WL 5407796, at *7-9.  Edelman Financial cites no information as actually being misappropriated, let alone sensitive business information such as strategic plans, pending orders, and manufacturing status.

17

Kissinger Financial Services v Kissinger, 2021 WL 1017400 (D. Md. March 17, 2021) involved allegations that former employees misappropriated "client lists, client contact and financial information, and other confidential and/or proprietary information." The Court did not consider whether such allegations supported a motion for TRO. Rather, the Court merely determined that such allegations were sufficiently pled to survive Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6). Clearly, a Rule 12(b)(6) motion assessed under liberal pleading standards to survive dispositive motion practice is wholly irrelevant to the Court's consideration of Plaintiff's request for a TRO predicated on its likelihood to succeed on the merits of a claim under the trade secrets act.[9] Kissinger Financial has no relevant guidance for this Court's consideration as there was no discussion of the merits of trade secret status other than the Court's statement that trade secret protection would be afforded as to business information which included business plans, training materials, development plans, bidding and pricing procedures, market strategies, internal performance statistics, financial data, and operational and administrative plans. Kissinger Financial, 2021 WL 1017400, at *7-8. Edelman Financial cites no information as actually being misappropriated, let alone sensitive business information of this nature.

Albert S. Smyth v. Motes, 2018 WL 3635024 (D. Md. July 31, 2018) involved a family jewelry business whose COO was alleged to copied and removed via a Dropbox account plaintiff's business information which he allegedly utilized as the template for a new business. The information at issue was the "companies' books and records" which included employment records, business plans/strategies, pricing information, and vendor lists as well as "decades of customer records and lists that contain the buying habits of over 69,000 customers." In denying Defendants' motion to dismiss the claim for misappropriation of trade secrets, the Court stated that "complaint

---

[9] Courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defense" through a Rule 12(b)(6) motion. Edwards v City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).

18

alleges that [Defendant] accessed [Plaintiff's] trade secrets seven times after his employment was terminated, and five times after he filed documents with the state of Maryland to open a competing jewelry business. **Rather than conclusory statements, [Plaintiff] offers specific allegations detailing how and when its business records were accessed.**" Smyth, 2018 WL 3635024, at *3-5 (Emphasis added)(internal citations omitted).   Edelman Financial impermissibly relies on "conclusory statements" as opposed to "specific allegations detailing how and when its business records were accessed."   Plaintiff does not cite any specific records being misappropriated, let alone sensitive business records akin to the "buying habits of 69,000 customers."

Blades of Green v. Go Green Lawn, 2022 WL 1136888 (D. Md. April 18, 2022) also involved whether Plaintiff's complaint was sufficiently pled to survive a Rule 12(b)(6) motion. Therein, it was alleged that defendant competitor firm induced current and former employees to misappropriate confidential information as evidenced by marketing materials that included "unattributed, verbatim recitation of phrases used in [Plaintiff's] materials."   Defendant's unsuccessful basis for dismissal was solely whether the trade secrets claim should "be dismissed for failure to sufficiently allege the requisite nexus to interstate commerce."   Blades of Green, 2022 WL 1136888, at *9-11.  Such issue is irrelevant to this Court's assessment of the likelihood of Edelman Financial succeeding on the merits of its claim for trade secret misappropriation.

Home Paramount Pest v FMC Corp., 107 F. Supp. 2d 684 (D. Md. 2000) determined that customer names, addresses, and home numbers of various pest control companies were not trade secrets under the Maryland statute as names and addresses were obtainable through public sources such as a phone directory and trade associations. Id. at 693.

Padco Advisors v Omdahl, 179 F. Supp. 2d 600 (D. Md. 2002) denied a motion for summary judgment which sought dismissal of a claim pursuant to the Maryland UTSA with

respect to an allegedly misappropriated database of customer information.  The Court made no determination that the information in question was a protectable trade secret and particularly no such assessment in the context of a motion for TRO.  The legal authorities relied upon by Edelman Financial do not remotely support the propositions for which Edelman Financial seeks to use them.

Despite having had almost a month after Mr. Butera's departure to review its records and computer systems for evidence of misappropriation, Edelman Financial offers no evidence in this case that even remotely resembles the kind of evidence Maryland courts have relied upon to issue injunctions in cases involving alleged trade secret status of customer lists.  Instead, Edelman Financial asks the Court to infer that Mr. Butera took and used client information when he resigned, upon information and belief, and without any evidence of misappropriation.  There is no basis for any such inference.  Edelman Financial's conjecture is directly contradicted by Mr. Butera's own sworn affidavit, which establishes that he did not take any protected information.

There is no trade secret information at issue here, and no evidence that any trade secret was misappropriated, or threatened to be misappropriated, by Mr. Butera.  Edelman Financial has not demonstrated a likelihood of success on the merits of its trade secret claims.  Moreover, these claims, devoid of supporting evidence, are arguably made in bad faith which subjects  Edelman Financial to paying Defendant's attorney's fees per Md. Code Ann., Comm. Law § 11-1204(1).

### b.      Breach of Contract

As discussed, the breach of contract claim, as best can be understood, distills to: 1. Solicitation of customers; 2. Solicitation of an Edelman Financial employee to resign; and 3. Acceptance of accounts from customers that made their own decision to leave Edelman Financial.

### i.      <u>Mr. Butera did not solicit former customers</u>

As an overarching principle, the showing of "likelihood success on the merits" lacks credibility when Edelman Financial accuses Mr. Butera of conduct that is standard within the

industry.  Courts around the country ruling in financial services cases have held that announcing a change of affiliation is not an improper solicitation. See Edward D. Jones & Co. , L.P. v. Kerr, 415 F. Supp. 3d 861, 873-74 (S.D. Ind. 2019) ("[o]ur own research reveals that the majority of courts who analyze this issue within the context of the financial broker/dealer industry reject the theory that an "announcement," like Mr. Kerr's, qualifies as a solicitation, even where an employment agreement prohibits both indirect as well as direct solicitations."); Merrill Lynch, Pierce, Fenner & Smith Inc. v. Brinkman, No. CV-08-1751-PHX-FJM, 2008 WL 4534299, at *2 (D. Ariz. Oct. 3, 2008) (defendants "should have advised the customers that they were leaving, and that the customers would be free to stay with Merrill Lynch or go with them to their new firm.  We reject Merrill Lynch's contention that they could not at least do this"); FTI Consulting v. Graves, 2007 WL 2192200, at *7 (S.D.N.Y. 2007) (defendant did not solicit clients by informing them he was leaving to accept competing position, as "[t]he Employment Agreement only restricts … active solicitation of FTI's clients; simply informing them of [defendant's] departure is not restricted by the contract's terms"); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor, 194 F.R.D. 618, 620 (N.D. Ill. 2000) (a prohibition against advising customers of departing broker's new affiliation would be "unlawful, as well as unreasonable"); Wells v. Merrill Lynch, 919 F Supp. 1047, 1053 (E.D. Ky. 1994)("a mere informational contact [with a] former client does not constitute a '*solicitation*' under the employment agreement.  An informational contact would consist of any written or oral contact that provides information about Plaintiffs' whereabouts and how they may be contacted"); Capstone Fin. Advisors, Inc. v. Plywaczynski, 46 N.E.3d 419, 421 (Ill App. 2nd 2015)(affirming denial of TRO where trial court found "it is more likely than not that the public policy of Illinois requires the fiduciary CFP to give [his clients] that [updated] contact information, which does not constitute solicitation");  Getman v. USI Holdings Corp., No. 05-3286-BLS2, 2005

21

WL 2183159, at *4 (Mass. Super. Ct. Sept. 1, 2005) (providing notice to clients that one is leaving their current employ and going elsewhere – providing new address, telephone number, and email address – "Such notice is common courtesy").

Edelman Financial made no showing of likelihood to succeed on the merits of these claims. It relies on conclusory statements and conjecture. For example, "On or about May 16, 2022, Edelman became aware that Defendant had contacted, solicited, and accepted business…" (See Dunker Dec. ¶42).  Mr. Dunker suggests that Edelman "became aware" that Mr. Butera was wrongfully soliciting business.  However, there is no suggestion how Edelman Financial "became aware" nor any reference to supposed communications.  Edelman Financial makes no mention of a forensic examination or review of emails.  It offers no customer statements as to their communications with Mr. Butera.  It suggested no witnesses or identified any individuals with firsthand knowledge of these supposed breaches.  Mr. Butera cannot solicit customers but, there is not a blanket prohibition from ever speaking to his customers.  He can permissibly announce that he joined a new financial services firm; which is exactly what happened.  The agreement does not prohibit announcements.   Injunctive relief has been denied upon similarly deficient factual showings.  See e.g., Edward D. Jones & Co., L.P. v. Kerr, 415 F. Supp. 3d at 868 (denying TRO where multiple Edward Jones employees provided affidavits without identifying the source of their statements that Mr. Kerr mailed packets advising of the services his new firm offered).

Defendant offered uncontroverted evidence to the contrary in the form of Mr. Butera's sworn affidavit.  Mr. Butera affirmatively stated that he did not misappropriate any trade secret, proprietary or confidential information belonging to Edelman Financial.  Mr. Butera affirmatively stated that he did not solicit any customers to leave Edelman Financial.  Mr. Butera affirmatively stated that he did not solicit any employees to leave Edelman Financial.  These uncontroverted

22

affirmations based on first-hand knowledge are the only firm first-hand knowledge and evidence before the Court at this time.  Furthermore, The CFP® code of ethics supports such a neutral announcement strategy in stating, at 1(a)(iii) states, "Act without regard to the financial or other interests of the CFP® professional, the CFP® Professional's Firm, or any individual or entity other than the Client, which means that a CFP® professional acting under a Conflict of Interest continues to have a duty to act in the best interests of the Client and place the Client's interests above the CFP® professional's."

Perhaps recognizing the overwhelming weight of authority on this point, as well as its lack of evidence to support its solicitation claims, Edelman Financial does not even address the distinction between announcements and solicitation in its briefing, and instead opts to conflate the two.  A customer's decision to transfer does not demonstrate solicitation, nor does mere initiation of contact violate a covenant not to solicit, in the absence of actual solicitation.  Edelman Financial's interpretation of Mr. Butera's contract is not even supported by the text of the contract itself.  The agreement provides only that Mr. Butera may not "solicit," but does not purport to prohibit him from contacting clients, or from announcing his change of employment.  If Plaintiff wished to restrict such activities, it could have drafted such a restriction.  It did not.

Moreover, to the extent that Edelman Financial purports to claim that Mr. Butera has done more than announce his change of employment to clients, its claims are not supported by any meaningful evidence or even a single declaration from a client.  The solicitation claims appear to be founded solely on conjecture based on clients' decisions to transfer their accounts.  Of course, a client's decision to transfer his or her account does not in any way prove or even suggest that the client was solicited.  To the contrary, clients can reach the decision to transfer their accounts on their own and without any solicitation, because they simply wished to continue working with Mr.

23

Butera.  In stark contrast, Edelman Financial offers only conjecture and supposition to base its request for an injunction that is designed to deprive Mr. Butera of his livelihood.

### ii.   Mr. Butera has not solicited Employees of Edelman Financial

Mr. Dunker attests, "**In my experience**, based on the fact that they resigned on the same day, it is reasonably likely that Defendant solicited [Client Services Associate] Niki Wheeles, directly or indirectly, to resign with him…"  (See Dunker Dec. ¶41)(Emphasis added).  Neither Mr. Dunker nor Edelman Financial offers any evidence that Ms. Wheeles was wrongfully solicited. Mr. Butera affirmatively states based on firsthand knowledge that he did not solicit employees.

### iii.   Edelman Financial Cannot Prevent Non-Party Public Customers from Choosing to Work with Mr. Butera

What remains is Edelman Financial seeking to disregard its public proclamations that it always puts the client's interest first in lieu of its selfish interest to take away free will and dictate to non-party public customers who is allowed to service their accounts.  Much as they view their employees, Edelman Financial apparently believes that they own the customer relationships and that public customers are not permitted to make their own decisions as to who they want to work with.  Edelman Financial's posture is a shocking betrayal of its duty to act in the best interests of the customers and to honor the customer's wishes to continue a working relationship with someone that has services their investments for more than a decade.

For a restrictive covenant to be enforceable "(1) the employer must have a legally protected interest, (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the employee, and (4) the covenant cannot violate public policy." Medispec, Ltd. v. Chouinard, 133 F. Supp. 3d 771, 773 (D. Md. 2015).  Edelman Financial made no effort to argue these elements in an attempt to suggest that the restrictive covenants are enforceable.

24

Here, enforcement of the "non-acceptance" provision strongly violates public policy by denying consumers of financial services their right to work with an advisor of their choice, particularly amidst ongoing uncertainty and volatility with the securities markets. It also stands in stark contrast to Edelman Financial's representations that it puts clients' interests first.

The financial services industry has a robust history of protecting the rights of consumers to make choices in determining who will provide them with financial services. In light of the problems presented by any prohibition to accept or service accounts, such as what Edelman Financial now seeks, the Financial Industry Regulatory Authority ("FINRA"),[10] with the consent of the SEC, promulgated Rule 2140, which states in full,

> No member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative where the account is not subject to any lien for monies owed by the customer or other bona fide claim. **Prohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery, or acceptance of a written request from a customer to transfer his or her account.** Nothing in this Rule shall affect the operation of Rule 11870.

FINRA Rule 2140 (emphasis added). This general principle has been around in one iteration, or another, for seventeen years. History clarifies the reason this rule exists: customers are harmed by judicial intervention which inhibit their ability to complete their desired transactions.

The first iteration of FINRA Rule 2140 was set forth in a National Association of Securities Dealers ("NASD") Notice to Members 02-07.[11] This version provided that "it is inconsistent with just and equitable principles of trade for a member or person associated with a member to interfere

---

[10] While Edelman Financial is not a FINRA member, it is an investment advisory firm regulated by the SEC which also regulates FINRA and approves its rules. It would therefore be incongruent for the public policy behind the FINRA Rules not to apply here where investment advisors are governed under an even higher fiduciary ongoing duty of care than are FINRA Members more traditionally subject to time of recommendation suitability obligations. See, e.g., FINRA Rule 2111 https://www.finra.org/rules-guidance/rulebooks/finra-rules/2111. Furthermore, FINRA guidance, being subject to SEC approval, is instructive of the regulatory environment in the securities industry.

[11] https://www.finra.org/rules-guidance/notices/02-07

with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative, provided that the account is not subject to any lien for monies owed by the customer or other bona fide claim." (See NASD Notice to Members 02-07) This rule interpretation was passed, noting that NASD members had sought Court relief ordering "new employers to reject customer account transfers received from the registered representatives new firm" where other courts had "ordered the registered representative's new firm to send letters to customers who may have been solicited in breach of an employment agreement stating that the firm is prohibited from having contact with that customer." (See NASD Notice to Members 02-07) The Notice to Members deters member firms from improperly using the judicial process to hamstring client account transfers. This is precisely because the customers' interests must take precedent above all.

In 2008, FINRA filed a proposed rule change (SR-FINRA-2008-052) with the SEC pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934. On March 3, 2009, the SEC submitted Release No. 34-59495[12] granting approval of the proposed rule change. This proposed rule change would be subsequently known as FINRA Rule 2140. The primary goal of FINRA Rule 2140 as stated by the SEC was "to address the practice of delaying customer account transfers." (See Release No. 34-59495) In adopting the proposed rule change, the SEC noted that "FINRA expressed concern that the registered representative's former firm, concerned that its former employee may have breached his or her employment contract by sharing client information with the new firm or by soliciting clients to transfer their accounts to the new firm, sometimes would seek a court order to prevent the transfer of accounts." (See Release No. 34-59495) Indeed, preventing "customers from following a registered representative to a different firm is

---

[12] https://www.sec.gov/rules/sro/finra/2009/34-59495.pdf

26

similar to the unfair practice of delaying transfers that the prior Notice had warned about." (See Release No. 34-59495)   The SEC explicitly acknowledged that it did not restrict members from pursuing "other remedies they may have" and that the policy was "limited to restricting a member from interfering with a customer's right to transfer his or her account once the customer has asked the firm to move the account." (See SEC Release No. 34-59495)   Ultimately, the SEC found that such a requirement was consistent with 15 U.S.C. 78o–3(b)(6), requiring that FINRA Rules be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and, in general, to protect investors and the public interest" and that "the proposed rule change should continue to protect investors and the public interest by addressing interference with the transfer of customer accounts in the context of employment disputes..." (See Release No. 34-59495)  While not strictly subject to FINRA rules nor its jurisdiction, Edelman Financial will have a difficult time arguing that it is not subject to federal securities laws to include its obligation to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and, in general, to protect investors and the public interest.  The very conduct which Edelman Financial now seeks to engage in, interfering with the transfer of customer accounts in the context of an employment, has clearly been identified by the SEC as objectionable conduct in the financial services industry.

Recent FINRA guidance, FINRA Reg. Notice 19-10,[13] also underscores this point.  (See FINRA Reg. Notice 19-10)  FINRA Reg. Notice 19-10 was issued to address "the responsibilities of member firms when communicating with customers about departing registered representatives." (See FINRA Reg. Notice 19-10)  FINRA initially noted that "Registered representatives move with some frequency between member firms and across financial firms under various regulatory

---

[13] https://www.finra.org/rules-guidance/notices/19-10

27

jurisdictions, such as investment advisory firms and insurance companies." (See FINRA Reg. Notice 19-10) Consistent with this acknowledgement, FINRA noted a member firm's duty to "communicate clearly, and without obfuscation, when asked questions by the customers about the departing registered representative." (See FINRA Reg. Notice 19-10) Such communications would include clarification that the customer may "transfer [his or her] assets to another firm" and "provide reasonable contact information" of the departing representative. (See FINRA Reg. Notice 19-10) Ultimately, "**Customers should not experience an interruption in service as a result of a registered representative's departure**." (See FINRA Reg. Notice 19-10)

These FINRA Rules, as approved by the SEC, are largely consistent with what Edelman Financial represents to the world, namely that it "is adhering to a fiduciary standard and putting the interests of [its] clients first." Here, by contrast Edelman Financial shockingly disregards the customer's right to make their own decisions amidst a discomforting securities market downturn.

The CFP® Board Code of Ethics similarly bears worth mentioning as Mr. Butera was under an obligation to provide information as to any "Material" changer or "[a]ny ... information about the CFP® professional or the CFP® Professional's Firm that is Material to a Client's decision to engage or continue to engage the CFP® professional or the CFP® Professional's Firm" to his clients. (CFP® Rule 10(a)(viii)) The fact that their trusted advisor of many years is no longer associated with Edelman Financial is similarly important for any client to decide whether to continue to engage with the CFP® Professional's former firm, i.e. Edelman Financial. As such, not only was the announcement proper, but Mr. Butera was legally obligated to provide it consistent with his fiduciary duties to his clients and as a CFP® certificant.

### c.      Breach of Fiduciary Duty and Unfair Competition Claims

Edelman Financial is also unlikely to prevail on its claims for breach of fiduciary duty or unfair competition. Edelman Financial devotes little more than a single page addressing both of

28

these claims in completely conclusory format.  Edelman Financial does not explain the elements of the claims or demonstrate how each element is met; such scant and incomplete briefing warrants denial alone.

There is also an open question of law as to whether the Maryland Uniform Trade Secrets Act, Md. Code Ann., Comm. Law § 11–1207, preempts claims for breach of fiduciary duty and unfair competition.  As noted in Allstate Ins. Co. v. Warns, a case cited by Edelman Financial,

> In deciding an independent cause of action for equitable relief exists, the court does not at this time address the relationship between the Maryland Uniform Trade Secrets Act (MUTSA) and common law breach of fiduciary duty claims. The MUTSA preempts at least some common law claims for breach of fiduciary duty, as it is the 'exclusive remedy for civil claims based on misappropriation of trade secrets.' ... While Allstate does not contend any of the information at issue in this case would constitute trade secrets, several courts have found Uniform Trade Secrets Act statutes to preempt or abrogate any common law claim based on the disclosure or misappropriation of confidential business information—whether or not the information rises to the level of a trade secret. ... The parties did not address MUTSA preemption in their briefs before this court, and the Maryland Court of Appeals has not yet spoken on this issue. Accordingly, the court declines to decide the scope of MUTSA preemption at this preliminary stage of the litigation.

No. CIV. CCB-11-1846, 2012 WL 681792, at *8 (D. Md. Feb. 29, 2012) (internal citations omitted).  As such, Edelman Financial has not met its burden that it is "likely" to succeed on the claims as there is an open question of law as to whether these claims are even viable under these facts.

Under Maryland law, the doctrine of unfair competition is amorphous and highly fact specific, with the doctrine of unfair competition being described as:

> While [the law] encourages fair trade in every way and aims to foster, and not to hamper, competition, no one, especially a trader, is justified in damaging or jeopardizing another's business by fraud, deceit, trickery, or unfair methods of any sort.... What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception.

29

Baltimore Bedding Corp. v. Moses, 34 A.2d 338 (Md. 1943).  Edelman Financial provides no evidence of "fraud," "deceit," or "trickery."   Rather, it relies on the non sequitur "in my experience" followed by conclusory statement about what Mr. Butera must have done (despite no supporting evidence whatsoever).  Given how open ended and fact specific a claim for unfair competition is, and how undeveloped the necessary factual record is, Edelman Financial cannot establish that it is "likely to prevail on the merits."

As to Edelman Financial's claim for breach of fiduciary, no argument is made to explain the existence of a fiduciary duty or how such a duty was breached independent of the other claims asserted by Edelman Financial.  The entire analysis provided by Edelman Financial is derivative of its trade secret and breach of contract claims and falls on the same ground as those claims.  As such, the breach of fiduciary duty and unfair competition claims fail for the same reasons as the trade secret and breach of contract claims.

### 2.    The Balance of Hardships Weighs in Favor of Mr. Butera.

The balance of hardships test requires that the court weigh the claimed "irreparable harm" which Edelman Financial would suffer if relief is not granted against the harm that Mr. Butera would suffer if an injunction is granted. A claim or injury is not "irreparable" if there is an adequate remedy at law for such claim or injury. Sampson v. Murray, 415 U.S. at 88; Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir. 1984). Moreover, "an injury or claim is "irreparable" only if it cannot be undone through monetary remedies." Enterprise Int'l, Inc. v. Coporacion Estatal Petroleva Ecuatoriana, 762 F.2d 464, 472 (5th Cir. 1985) (quoting Deerfield Medical Ctr. v. City of Deerfield, 661 F.2d 328, 338 (5th Cir. 1981)); American Express Fin. Adv., Inc. v. Temm, 241 F. Supp. 2d 30 (D. Me. 2003); see also American Express Fin. Adv., Inc. v. Torley, et al., 971 F. Supp. 780, 783 (W.D. N.Y. 1997). Any loss defined in terms of money does not constitute irreparable harm. Hughes Network Systems, Inc. v. Interdigital Com. Cop., 17 F.3d

30

691, 693 (4th Cir. 1994); accord Torley, supra, 971 F. Supp. at 783; Morgan Stanley DW, Inc. v. Frisby, 163 F. Supp 2d 1371, 1376 (N. D. Ga. 2001). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to meet the standard of "irreparable." Virginia Petroleum Jobbers Ass'n v. Federal Power Comm., 259 F.2d 921, 925 (D.C. Cir. 1958) (quoting Sampson v. Murray, supra, at 92). As noted above, to qualify as "irreparable," injury must be "neither remote nor speculative" but actual and imminent," Tucker Anthony Realty Cop. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989); see also Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991); Dan River, Inc. v. Icahn, 701 F.2d 278, 284 (4th Cir. 1983).

The loss of revenue generated by Mr. Butera's clients does not rise to the level of irreparable harm warranting the issuance of a TRO. The issue of whether a financial firm is suffering irreparable harm based solely upon its loss of commissions was squarely addressed by Judge Morgan of the United States District Court for the Eastern District of Virginia in the case captioned Prudential Securities, Inc. v. Plunkett, 8 F.Supp.2d 514 (E.D. Va. 1998). In Plunkett, Judge Morgan held that, in the absence of evidence that a departing broker is damaging the goodwill or reputation of his former employer, the firm's loss, if any, is limited to commissions which would have been earned by the firm had the broker and the customers remained. Because these damages are quantifiable in terms of money, they do not constitute irreparable harm. Plunkett, 8 F.Supp.2d at 518.

Moreover, in denying similar requests for injunctive relief, other courts have looked skeptically on allegations of irreparable harm by multi-billion-dollar corporations involving a single advisor in a small branch office. E.g. J.P. Morgan Securities, LLC v. Riley, United States District Court for the W.D. of MI, docket no. 1:20-cv-00736-HYJ-RSK; Order denying TRO

31

dated August 20, 2020 [dkt. Entry 32] and Transcript of Preliminary Injunction Hearing held on August 19, 2020[14] [dkt entry 33].

Here again, Edelman Financial has nearly $300 billion in assets under management. Transferred assets at issue constitute .0001% of the Edelman Financial's assets.  As similarly observed by Judge Neff, it is a laughable proposition that a single advisor in a small branch in the suburbs could inflict irreparable harm on a financial giant like Edelman Financial.  On the other hand, Edelman Financial seeks to inflict significant hardship on Mr. Butera and his ability to provide for his family.  His business and reputation were built on trust and confidence through customer relationships dating back twenty years or more.  The mere filing of a lawsuit intimates supposed untoward conduct and the issuance of an injunctive order would only further damage Mr. Butera's reputation.  Moreover, his reputation and concomitant ability to earn a living will be fractured if public customers are told that their decisions to work with Mr. Butera will not be honored.  An injunction also seeks to chill Mr. Butera's obligations with respect to the CFP® Board, which Edelman Financial knows of and profited off of for years.

Balancing the hardships of this case shows that Mr. Butera will suffer far greater harm from issuance of a temporary restraining order than Edelman Financial would bear should an injunction be denied. Indeed, Edelman Financial is not suffering any damage that rises to the level of irreparable harm. Its affidavit, which include opinions and conclusions, do not state facts

---

[14] The Honorable Judge Janet Neff, U.S. District Judge, for W.D. of MI, stated that:

> Then the question is whether the Plaintiff will suffer irreparable injury? The second leg of the stool. I just don't see how anybody could come to a -- you know, I have been wrong before, I'll admit that, **but I don't see how you could come to the conclusion that a single financial advisor in a small branch bank in Okemos, Michigan, which is a suburb of Lansing, Michigan, could inflict irreparable harm on a financial giant like J.P. Morgan. The Plaintiff makes the argument, which is really, I think, I don't know, almost laughable** -- I hope you don't take offense. But you claim that another aspect of irreparable harm is that office morale and stability will be jeopardized. I mean, please. That just -- I think that just undermines your whole argument when you make an argument like that.

Transcript of Preliminary Injunction Hearing held on August 19, 2020 [dkt. Entry 33](emphasis added).

sufficient to show any possible damages that would not be quantifiable; Edelman Financial ultimately seeks to quantify and recover revenue associated with transferred out customer accounts. Such economic damages are regularly proven in exactly this type of case. Merrill Lynch, Pierce, Fenner & Smith v. Brinkman, No. CV-08-1751-PHX-FJM, 2008 WL 4534299, at *2 (denying TRO among other reasons because "the identification of lost clients and the determination of associated damages would not be difficult within the scope of the parties' arbitration agreement").

> 3.    **Public Policy Strongly Favors the Free Movement of Customers and therefore Heavily Weighs Against the Proposed Injunctive Relief.**

As to whether granting the requested temporary restraining order is in the public interest, the answer is **no**. Granting a temporary restraining order would contravene Maryland's public policy. See Ruhl v. F.A. Barlett Tree Expert Co., 225 A.2d 288, 293 (Md. 1967) ("The right to labor or use one's skill, talents, or experience for one's benefit, or furnish them to another for compensation, is a natural and inherent right of the individual")(citations omitted); Operations Research, Inc. v. Davidson & Talbird, Inc., 217 A.2d 375, 389 (Md. 1966) (Public Policy supports "the free competition basic to our national development as well as to the individual rights of employees who want to go into business for themselves that their spirit of enterprise be not unduly hampered").

Moreover, the public interest favors permitting customers their choice of broker and recognizes that the client relationship belongs to the financial advisor and not to the firm. Wachovia Sec., LLC v. Stanton, 571 F. Supp. 2d 1014, 1048-49 (N.D. Iowa 2008) ("[t]he public interest concern about enforceability of the covenants, in turn, weighs against Wachovia's likelihood of success on the merits of its breach-of-contract claim, ... and also weighs against satisfaction of the 'public interest'"); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Liniere, 572

F. Supp. 246, 249 (N.D. Ga. 1983) (concluding that the public interest weighs in favor of allowing the relationship between the customer and his broker to continue when the broker changes firms because "[t]he public has a greater interest in being able to choose whether to follow its broker to a new firm or to remain at the old firm with a new broker"); see also Edward D. Jones & Co., L.P. v. Kerr, 415 F. Supp. 3d at 876 (departing advisors "should not be foreclosed from issuing good-faith communications to clients notifying them that he or she has a left a firm. Such a restriction infringes on the rights of consumers more than it protects the plaintiff-employers").

As set forth above, there are also a number of rules governing financial professionals such as Mr. Butera and Edelman Financial which clearly show the paramount importance of a customer being able to work with the financial professional of his or her choosing.  Such rules include the Code of Ethics and Standards of Conduct of the CFP® Board of which Mr. Butera is a member. It also includes the rules regulating brokers, approved by the SEC in order to protect consumers.

Moreover, it cannot be understated the frightening and chilling effect that Edelman Financial's request for relief would have upon non-party public customers who are almost assuredly uncomfortable and concerned about the volatility of their investment portfolios over the last year.  Edelman Financial seeks to turn its back on its public proclamations of putting client' interest first in furtherance of its own selfish interests.  Amidst a volatile securities market, Edelman Financial is seeking the authoritarian power to tell non-party public customers whom they are allowed to work with.  Edelman Financial does not care that these public customers have built a relationship of trust and confidence in Mr. Butera over a nearly twenty-year period in some cases.  Edelman Financial does not care that these public customers have expressly said that they do not want to work with Edelman Financial.  In Edelman Financial's world, their own selfish interests always come first, and what the client wants is of secondary concern, if at all.  These non-

34

party public customers have no agreement that restricts their ability to choose who they want to work with and these non-party public customers certainly have no agreement that tethers them to Edelman Financial for eternity.

## CONCLUSION

As set forth above, Mr. Butera did not improperly solicit any clients. Mr. Butera did not improperly solicit any Edelman Financial employees. Most of all, Mr. Butera did not steal any of Edelman Financial's trade secrets, however Edelman Financial chooses to define those. As such, Mr. Butera complied with all of his applicable legal obligations and therefore Edelman Financial has not demonstrated a likelihood of success on the merits. Moreover, the relief sought by Edelman Financial serves only to harm individuals who are not parties to this action and simply want to work with the financial professional of their choosing.

Respectively submitted,


This 10th day of June, 2022.


/s/ Richard J. Berwanger, Jr.

| | |
|---|---|
| Richard J. Berwanger Jr. (Bar No. 17835) | Denis Dice, Esq. (pro hac forthcoming) |
| Matthew P. Kraeuter (Bar No. 29252) | Joel Wertman, Esq. (pro hac forthcoming) |
| | Douglas Fogle, Esq. (pro hac forthcoming) |
| FROST LAW | |
| | WINGET, SPADAFORA AND SCHWARTZBERG, LLP |
| 839 Bestgate Road, Suite 400 | 1528 Walnut Street Suite 1502 |
| Annapolis, MD 21401 | Philadelphia, PA 19102 |
| 410-497-5947 | 215-433-1500 |
| 888-235-8405 (fax) | 215-433-1501 (fax) |
| | |
| richard.berwanger@askfrost.com | Dice.d@wssllp.com |
| matt.kraeuter@askfrost.com | wertman.j@wssllp.com |
| | fogle.d@wssllp.com |

*Attorneys for Scott Butera*


35

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I served the foregoing document to the following through CM/ECF on:

Alec W. Farr, Esq.
Perkins Coie LLP
700 13th Street, NW
Suite 800
Washington, DC 20005
Email: afarr@perkinscoie.com

Date:   June 10, 2022                              */s/ Richard J. Berwanger, Jr.*
                                                  Richard J. Berwanger Jr.

36