```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND

                                  :
EDELMAN FINANCIAL ENGINES, LLC
                                  :
    v.                            :  Civil Action No. DKC 22-1388
                                  :
SCOTT BUTERA
                                  :
```

**MEMORANDUM OPINION**

Plaintiff Edelman Financial Engines, LLC, a financial services company, filed a complaint against Scott Butera after Mr. Butera, a financial planner, left his position at Edelman, affiliated with a competing company, LPL Financial LLC, and allegedly solicited clients and began performing business for them in violation of Restrictive Covenants.[1]  Edelman brings claims for violations of the Defend Trade Secrets Act, Breach of Contract (two counts), Maryland Uniform Trade Secrets Act, Breach of Fiduciary Duty of Confidentiality, and Unfair Competition.  Along with the complaint, Edelman filed a motion for temporary restraining order and preliminary injunction.  An opposition was filed by Mr. Butera (ECF No. 13), as was a reply by Edelman (ECF

---

[1] Another Edelman employee allegedly left at the same time and joined Mr. Butera at his new company.  Edelman's complaint includes allegations of wrongdoing by Mr. Butera in this regard (Count III) but it does not currently seek injunctive relief with regard to that other employee.

No. 17). A hearing was held on Monday, June 13, 2022. As clarified at the hearing, Edelman seeks to enjoin Mr. Butera from:

> Directly or indirectly, individually, or through an agent, employee, or on behalf of another, initiating contact with, or otherwise soliciting, persuading, or inducing, or attempting to solicit, persuade or induce any client of Edelman with whom Defendant has worked, communicated, or dealt with on behalf of Edelman, or any other client of Edelman that received services from any office, branch, or principal work location at which Defendant was based during his employment to terminate, reduce or not renew its relationship with the Partnership Group;

> AND

> Directly or indirectly, individually or through an agent, employee, or on behalf of another, soliciting, engaging in, performing, diverting, or accepting any business of the same or similar nature to the business of Edelman with or from any client of Edelman whom Defendant has solicited or with whom Defendant has worked, communicated, or dealt with on behalf of Edelman, or any other client of Edelman that received services from any office, branch, or principal work location at which Defendant was based during his employment with Edelman [except those clients whose accounts have already been transferred to Mr. Butera's new company];

> AND

> From disclosing any Edelman trade secret or confidential or proprietary information, including the name and contact information of any client of Edelman to LPL Financial, Butera Wealth Management, or another person, firm, corporation, or entity that competes with Edelman.

**I.   Standard Of Review**

Temporary restraining orders ("TRO") and preliminary injunctions are "extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). According to the Supreme Court of the United States, the party seeking the preliminary injunction or TRO must demonstrate that: the party (1) is likely to succeed on the merits "by a clear showing"; (2) is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the party's favor; and (4) preliminary injunctive relief is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20-24 (2008); *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

**II.  Background**

Mr. Butera was employed at Edelman until his resignation on May 12, 2022, when he started his own company and affiliated with a competing company. While employed at Edelman, Mr. Butera executed two agreements, the Phantom Unit Award Agreement and the Restrictive Covenant Agreement. The Restrictive Covenant included the following terms:

> Participant hereby agrees that Participant will not . . . directly or indirectly, individually or through an agent, . . . during the Restricted Period:

3

(1) Initiate contact with, or otherwise solicit, persuade, or induce, or attempt to solicit, persuade or induce, any Client with whom Participant has worked, communicated or dealt on behalf of the Partnership Group, or any other Client that received services from any office, branch or principal work location at which Participant was based, to terminate, reduce or not renew its relationship with the Partnership Group; or

(2) Solicit, engage in, perform, divert or accept any business of the same or similar nature to the Business of the Partnership with or from any other Client or Potential Client whom Participant has solicited (directly or indirectly) or with whom Participant has worked, communicated or dealt on behalf of the Partnership Group, or any other Client that received services from any office, branch or principal work location at which Participant was based; or

(3) Disclose the names of any Client or Potential Client to any other person, firm, corporation or other entity; or

(4) Solicit, persuade, or induce, or attempt to solicit, persuade, or induce any vendor . . .; or

(5) Solicit, induce, persuade, directly or indirectly, any person then employed, or during the twelve (12) months immediately preceding such action was employed by the Partnership Group to terminate such employment in order to work for any entity engaged in the Business of the Partnership;

(6) Hire any person then employed, or during the twelve (12) months immediately preceding such action was employed by the Partnership Group to work for any entity

>     engaged in the business of the
>     Partnership; or
>
> (7) Assist any person, firm, entity,
>     employer, business associate or member of
>     Participant's family to commit any of the
>     foregoing acts.

(ECF No. 4-4, at 15-16).

The Restrictive Covenant defines "Client," "Potential Client," and "Business of the Partnership":

> Definition of Client and Potential Client. As used in this Agreement, the term "Client" shall mean any person who has, within the twelve (12) months prior to termination of Participant's association with the Partnership Group (whether by employment or otherwise) received services from any member of the Partnership Group. As used in this Agreement, "Potential Client" shall mean any person to whom any member of the Partnership Group, through any of its respective officers, employees, agents, or consultants (or persons acting in any similar capacity), has, within the twelve (12) months prior to termination of Participant's association with the Partnership Group (whether by employment or otherwise ), offered to provide services but who is not at such time a recipient of services from any member of the Partnership Group. The preceding sentence is meant to exclude cold calls, form letters, general advertising in mass media and blanket mailings. As used in this agreement, the terms "Client" and "Potential Client" shall not include persons and entities listed in Appendix A.
>
> Definition of Business of the Partnership. As used in this Agreement, the term "Business of the Partnership" shall refer to the following professional services: financial and retirement planning and investment management; production, distribution or broadcasting of investment advice, investment strategies, or the evaluation of investment

5

>     options through the medium of radio;
>     development, management and sale of managed
>     account products; and/or practice management
>     and business development consulting for the
>     financial industry.

(ECF No. 4-4, at 16). The Agreement does not define the term "solicit."

Plaintiff alleges that since resigning, Mr. Butera has solicited and accepted business from Edelman clients in violation of the Restrictive Covenant. (ECF No. 1, at ¶ 57). Plaintiff's counsel alleged at the hearing that Mr. Butera had 237 clients while working for Edelman. Thomas Dunker, an Edelman officer, attested in a declaration that, prior to Mr. Butera's resignation, Defendant had a book of business of more than 370 client accounts. (ECF No. 4-2, at ¶50). Mr. Dunker attests in his supplemental declaration that Mr. Butera has contacted at least eight individuals and at least eight couples who are or were Edelman clients. (ECF No. 17-1, at ¶5-20). Mr. Dunker further attests that, as of June 12, Mr. Butera has accepted business from a total of 33 client accounts. (ECF No. 17-1, at ¶ 26). The financial loss to Edelman has been inconsistently alleged as $36 million in its complaint, (ECF No. 1, at ¶64), and $31 million in the declaration of Mr. Dunker, (ECF No. 4-2, at ¶45). In any event, the alleged "outflow of assets under management" is in the tens of millions of dollars.

6

Mr. Butera, in an affidavit, denies soliciting any of his former clients. (ECF No. 13-1, at ¶10, 14). Rather, he states that he merely announced his new affiliation. (ECF No. 13-1, at ¶10). Mr. Butera states that his announcement simply advised the clients he contacted that he had left Edelman, joined a new firm, and provided his new contact information. Mr. Butera says that he only provided account transfer information to clients who wished to continue doing their business with him. (ECF No. 13-1, at ¶12). Mr. Butera also denies removing or retaining any client lists or other client data from Edelman. (ECF No. 13-1, at ¶7).

**III. Analysis**

    **A.  DTSA/MUTSA (Counts I and IV)**

Plaintiff alleges for both of its two trade secrets claims that Mr. Butera used Plaintiff's trade secrets to solicit Edelman's clients and then service them on behalf of LPL. (ECF No. 1, at 72, 73, 96). Under the DTSA, Edelman must show it owned a trade secret which was subject to reasonable measures of secrecy. *Philips North America LLC v. Hayes*, No. 20-cv-1409-ELH, 2020 WL 5407796, at *7 (D.Md. Sept. 9, 2020). Similarly, under the MUTSA, Edelman must show that it possessed a valid trade secret. *Id.*

The DTSA defines trade secret as:

> [T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques,

7

> processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
>
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). The MUTSA's definition is similar:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> >
> > (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md. Code Ann., Com. Law § 11-1201(e).

Edelman contends that its proprietary database of current, former, and prospective client lists and other confidential information related to and analyzing each client's assets and investment history has independent value, and otherwise satisfies the definition.

Edelman has no evidence that Mr. Butera took anything in tangible or digital form from Edelman when he left. Rather, Edelman merely alleges that Mr. Butera **must** have taken (and utilized) its trade secrets, because that is the only way he could have solicited his former clients. (ECF. No. 4-2, at ¶51). Mr. Butera attests that he did not remove or retain any client lists or other client data from Edelman, but instead that some of his clients are family members and friends, or that their contact information is available through publicly available sources. (ECF No. 13-1, at ¶7, 8). Counsel acknowledged at the hearing that "It" (presumably LPL) asked him to write a list of clients from memory when he began work for LPL and then to use publicly available sources to locate contact information. It is axiomatic that publicly available information is "generally known," and thus not a trade secret. Edelman contends, specifically, that the identity of a client carries with it the trade secret information that the person has net worth that merits having a financial advisor.

While it may be that Edelman can establish trade secret status for certain client information, it has neither yet done so clearly, nor shown that Mr. Butera misappropriated it. Moreover, to the extent that Mr. Butera disclosed trade secret information (the names of his Edelman clients) to his new employer, the harm is already done.

B.  **Breach of Contract (Count II)**

Edelman's breach of contract claim is premised on Mr. Butera's alleged violation of the Restrictive Covenant. The allegations can be sorted into allegations of "solicitation" and allegations of "acceptance" of business.

> In Maryland, a restrictive employment covenant will only be enforced if it meets four requirements: "(1) the employer must have a legally protected interest, (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the employee, and (4) the covenant cannot violate public policy." *Medispec Ltd. v. Chouinard*, 133 F.Supp.3d 771, 773-74 (D.Md. 2015) . . .

*Seneca One Finance, Inc. v. Bloshuk*, 214 F.Supp.3d 457, 461 (D.Md. 2016). Under Maryland law, employers have a protected interest in "preventing 'diversion of . . . business to the former employee who has had personal contacts with customers which the employer lacks.'" *ImpactOffice, LLC v. Siniavsky*, No. 15-cv-3481-TDC, 2016 WL 8672916 (D.Md. Nov. 18, 2016) (quoting *Tuttle v. Riggs-Warfield-Roloson*, 246 A.2d 155, 158-59 (Md. 1963)). Preventing the departure of goodwill generated by former employees is a different interest from preventing efficient competition. The latter is not a protected interest. *Id.*

Edelman's position is that the acceptance of business from former Edelman clients is so clearly a breach that it need not show an independent breach of the solicitation provision. It

10

claims to have done so, however, and defends the terms of the entire Agreement as reasonable and sufficiently limited in scope.

### 1. Solicitation

Edelman alleges that Mr. Butera solicited its clients in violation of the Restrictive Covenant. (ECF No. 1, at ¶82). Edelman relies on two declarations from its officer, Thomas Dunker. The first attested that Edelman "became aware that Defendant had contacted, solicited, and accepted business from several restricted Edelman clients[.]" (ECF No. 4-2, at ¶42). The second, described, somewhat cryptically, that, beginning the weekend after his resignation, Mr. Butera emailed or called "Edelman" clients to inform them of his resignation. (ECF No. 17-1, at ¶4-20). One of the emails was sent to a client's personal email address although Edelman normally communicated to the spouse. One of the emails is attached as an exhibit. It reads:

> As a financial planning professional certified by the CFP® Board, I am required to adhere to the CFP® Board's Code of Ethics and Standards of Conduct, which require that I disclose and to update any information about me or my firm that a reasonable client would consider material or important in making a decision about whether to engage or to continue to engage me as a professional or my firm. In compliance with my obligations, I am writing to inform you that I have resigned from Edelman Financial Engines and have become affiliated with Butera Wealth Management by LPL Financial.
>
> If you have any questions or would like to reach me, I can be contacted at:

11

>
> Butera Wealth Management
> 6701 Democracy Blvd, Suite 300
> Bethesda, MD 20817
>
> You can also reach me by phone: 240-855-0424.
> You can still reach Edelman Financial Engines
> at 888-752-6742
>
> Regards,
> Scott Butera, CFP®
> Butera Wealth Management
> Managing Director, Financial Advisor
> Direct: (240) 855-0424
> Email: Scott.Butera@lplfinancial.com
> 222.buterawealth.lpl.com

(ECF No. 17-2, at 2-3). Mr. Dunker states that a total of 33 client accounts had been transferred. At the hearing, counsel stated that Mr. Butera had 237 clients while at Edelman.

In contrast, Mr. Butera attests that he "announced [his] new affiliation to [his] new clients via either a written announcement or a telephone announcement." (ECF No. 13-1, at ¶10). He states that he "simply advised the clients [he] contacted that [he] had left Edelman Financial and joined LPL and provided [his] new contact information." (ECF No. 13-1, at ¶10). If clients had questions or asked for information, he answered those questions or provided the requested information. Otherwise, he ended the conversation. (ECF No. 13-1, at ¶11). At the hearing, counsel stated that Mr. Butera read from a script when making phone calls.

The Restrictive Covenant does not define solicitation, merely providing synonyms. The parties have not proposed a mutually agreeable definition. Maryland case law apparently does not

12

provide a definition. When in this position, other courts in this district have relied on the common meaning of solicitation as defined in dictionaries:

> Black's Law Dictionary defines "solicitation" as "[t]he act or an instance of requesting or seeking to obtain something; a request or petition." *Solicitation*, *Black's Law Dictionary* (10th ed. 2014). Merriam-Webster defines "solicit" as "to make petition to; to approach with a request or plea; to urge (as one's cause) strongly; to try to obtain by usually urgent requests or pleas." *Solicitation*, *Merriam-Webster Dictionary*, available at http://www.merriam-webster.com/dictionary/solicit (last visited Aug. 2, 2016). Courts that have considered claims of employee solicitation generally focus on factors such as: who initiated the contact, whether the actions allegedly constituting solicitation were proactive or responsive, and whether the alleged solicitation involved active persuasion. *See, e.g.*, *KPMG Peat Marwick LLP v. Fernandez*, 709 A.2d 1160, 1163 (Del. Ch. 1998); *see also Wolverine Proctor & Schwartz, Inc. v. Aeroglide Corp.*, 402 F. Supp. 2d 365, 371 (D. Mass. 2005); *Aetna*, 246 P.2d at 15; *Inland Am. Winston Hotels, Inc. v. Crockett*, 712 S.E.2d 366, 370 (N.C. Ct. App. 2011).

*Fyfe Co., LLC v. Structural Grp., Inc.*, No. 13-cv-176-CCB, 2016 WL 4662333, at *6 (D. Md. Sept. 7, 2016) (applying California law to contract and relying on dictionaries where restrictive covenant did not define "solicitation"). *See also Harris v. Meeks Heit Pub. Co.*, No. 99-cv-2226-L, 2001 WL 286835, at *3 (D.Md. Mar. 22, 2001) (applying Ohio law to contract and relying on Oxford English Dictionary where contract did not define "solicit"). Moreover, it is generally accepted that "simply announcing one's transition

from one firm to another, without any other action, does not constitute a solicitation" under the law of many states. *Edward D. Jones & Co. v. Barnes*, No. 1:20-cv-03775-JMC, 2020 WL 6827864, at *7 (D.S.C. November 20, 2020), citing *Edward D. Jones & Co., L.P. v. Kerr*, 415 F.Supp.3d 861, 873 (S.D.Ind. 2019). In *Barnes*, the defendant did more—contacting clients to schedule appointments, explicitly asking at least one to move their account, and sending paperwork with references to the transfer of accounts to many clients. *Id.*

In *Kerr*, the defendant, after joining his new employer, contacted his former clients to announce his transition. *Kerr*, 415 F.Supp.3d at 872. As here, the employment agreement did not define "solicitation," state law did not address whether contacting former clients to announce a transition is solicitation, and plaintiff's counsel argued for a broad definition of "solicitation." *Id.* at 871. ("[C]ounsel for Edward Jones requested at the hearing that we adopt a broad interpretation of the term, specifically arguing that 'indirect solicitation' means any initiated, targeted contact with Edward Jones's clients."). Nonetheless, the court found that "the majority of courts" that analyzed the issue in the context of the "financial broker/dealer industry" rejected the theory that an "announcement" qualified as a solicitation even where an employment agreement prohibits indirect and direct solicitation. *Id.* at 873. The *Kerr*

14

court joined that majority, finding that the defendant had not solicited plaintiff's clients when he announced to his former clients that he was moving to a different company. *Id.* at 874. *See also Bank of American Inv. Services, Inc. v. Byrd*, Nos. 2:09cv211, 2:09cv212, 2009 WL 10184606 (E.D.Va. June 15, 2009).

Although Plaintiff has clearly shown that Mr. Butera emailed and called some of his Edelman clients in the days immediately after he resigned, and that some of them have transferred their accounts, it has failed to make a clear showing that it is likely to succeed on the merits of its claim that Mr. Butera breached the Restrictive Covenant by **soliciting** clients. Edelman takes the position that **any** communication initiated or participated in by Mr. Butera that doesn't include the statement that he can't take their business is solicitation. It is far from clear that it is correct in that interpretation, or that Mr. Butera did more than merely announce his transition to a new company. Moreover, as with the trade secrets claim, it is unclear whether the activity is ongoing. Mr. Butara transitioned to LPL on May 12, and the Dunker declaration of June 12 details contacts up to May 26, 2022, but not beyond.

2.  **Accepting Clients**

Plaintiff's breach of contract claim also contends that Mr. Butera breached the Restrictive Covenant by accepting business

15

from former clients.[2]  Mr. Butera asserts that this aspect of the Restrictive Covenant should not be enforced because it violates public policy.

His argument for violating public policy centers on FINRA regulations that prohibit limitations on customers transferring their accounts.  He admits, however, that these regulations are not applicable to Edelman because it is not a FINRA member.  (ECF No. 13, at 33).

Maryland law does not appear to have definitively addressed this question, but it does offer some guidance.  In *Holloway v. Faw, Casson & Co.*, the Maryland Court of Appeals rejected a request to hold that non-competition agreements between accountants should be *per se* unlawful.  319 Md. 324, 338-39.  That argument was made by comparing the accountant-client relationship with the attorney-client relationship.  The Court of Appeals declined to join two other courts which had "held a restrictive covenant to be unreasonable because it adversely affected the public's ability to choose an accountant."  *Id.* at 337.  While the Court of Appeals didn't rule out the possibility that an agreement to not accept business could amount to violating public policy, this is a data point against defendant's argument.  The court did note, however,

---

[2] Edelman no longer seeks to enjoin Mr. Butera from continuing to do business with/for those clients who have already transferred their accounts.  Rather it seeks to enjoin him from doing so with others who are still with Edelman.

16

that "[t]he rule of reason by which current Maryland common law tests the validity of restrictive covenants considers the public interest as a factor[,]" but that the appellant had failed to convince them that that rule failed to adequately protect the public. *Id.*

Some other aspects of this type of restrictive covenant, however, can be problematic. For example, in *ImpactOffice, LLC v. Siniavsky*, No. 15-cv-3481-TDC, 2016 WL 8672916 (D.Md. Nov. 18, 2016), a non-solicitation provision prohibited "accept[ing], directly or indirectly, the business of any customer . . . of" plaintiff. *Impact Office*, 2016 WL 8672916, at *5. The defendants argued that the non-acceptance provision was overly broad, and the court agreed. Employers may have a protectable interest in preventing employees from using contacts established during employment to pirate the employer's customers. In this case, however, the provision was overbroad because it prohibited defendants from accepting business from customers with whom they had no prior relationship, but who, at some point, had done business with the plaintiff business. *Id.* As a result, the court rejected plaintiff's argument that the provision was designed to prevent former employees from circumventing a related non-solicitation clause. The court then utilized blue penciling to excise "accept" from the non-solicitation clause. *Id.* at 7.

The provision here is similar, prohibiting

17

> [A]ccept[ing] any business of the same or similar nature to the Business of the Partnership with or from any Client or Potential Client whom Participant has solicited (directly or indirectly) or with whom Participant has worked, communicated or dealt on behalf of the Partnership group, or any other Client that received services from any office, branch or principal work location at which Participant was based[.]

(ECF No. 4-4, at 15). Edelman is seeking to enforce its broad clause, stating at the hearing that it would provide Mr. Butera a list (even though it contains trade secrets) of those clients who received services at his former work location even if not from Mr. Butera. It is premature to resolve these very complex issues—the parties differ decidedly on their interpretations of the provision, with Edelman espousing a troubling, extremely broad interpretation. It has failed to make a clear showing of likelihood of success.

  **C. Breach of Fiduciary Duty of Confidentiality and Unfair Competition (Counts V and VI)**

Edelman's claims here seem to be derivative of its other claims. Its breach of fiduciary duty claim is based on allegations that Mr. Butera misappropriated trade secrets, and that he solicited clients. (ECF No. 1, at ¶99-100). The analysis is the same.

The unfair competition claim is premised on the allegations that Mr. Butera is using Edelman's misappropriated trade secrets. (ECF No. 1, at ¶104). Edelman has not, however, made a clear

18

showing of a likelihood of success on its misappropriation of trade secrets claims.

## IV. Conclusion

Accordingly, Edelman has failed to establish entitlement to temporary injunctive relief. It has moved for some expedited discovery in advance of a hearing on its motion for a preliminary injunction. Counsel are directed to confer with regard to a schedule. If agreement is reached, simply advise the court, and chambers will offer suitable dates for a hearing. If agreement cannot be reached, counsel are to submit letters outlining their respective positions and the court will convene a recorded telephone conference to set a schedule.

                                                         /s/
                                  DEBORAH K. CHASANOW
                                  United States District Judge